UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

MATTHEW A. KEMERLY,              )
                                )
        Plaintiff,              )
                                )
    v.                          )          CAUSE NO. 1:12-CV-00024
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security, )
                                )
        Defendant.              )

## OPINION AND ORDER

Plaintiff Matthew A. Kemerly appeals to the district court from a final decision of the

Commissioner of Social Security denying his application under the Social Security Act (the

"Act") for a period of disability and Supplemental Security Income ("SSI").[1]  (Docket # 1.)  For

the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Kemerly applied for SSI in April 2007, alleging disability as of May 1, 2004.  (Tr. 20.)

The Commissioner denied his application initially and upon reconsideration (Tr. 63-66, 68-70),

and Kemerly requested an administrative hearing (Tr. 71).  Administrative Law Judge ("ALJ")

Bryan J. Bernstein conducted a hearing on November 16, 2009, at which Kemerly, who was

represented by counsel; Kemerly's mother; and a vocational expert ("VE") testified.  (Tr. 35-60.)

On September 21, 2010, the ALJ rendered an unfavorable decision to Kemerly,

concluding that he was not disabled because he could perform his past relevant work as well as a

_____

[1] All parties have consented to the Magistrate Judge.  (Docket # 15); *see* 28 U.S.C. § 636(c).

1

significant number of other jobs in the national economy despite the limitations caused by his impairments.  (Tr. 20-34.)  The Appeals Council denied Kemerly's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-16.)

Kemerly filed a complaint with this Court on January 24, 2012, seeking relief from the Commissioner's final decision.  (Docket # 1.)  In his appeal, Kemerly argues that the ALJ improperly evaluated the opinions of Dr. Prevesh Rustagi, his treating psychiatrist, and Cynthia Schroeder-Clark, his long-time therapist.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 20-25.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Kemerly was twenty-six years old (*see* Tr. 29-30), had a high school diploma and some college education (Tr. 29, 43-44, 55), and had previously worked as a video game clerk, industrial cleaner, and factory laborer (Tr. 128, 188, 190; *see* Tr. 39-40, 42, 54).  Kemerly alleges that he became disabled as of May 1, 2004, due to major depressive disorder.  (Opening Br. 2.)

### B.  Kemerly's Testimony at the Hearing

At the hearing, Kemerly testified that he lives with his parents and that he had studied graphic arts for two years at the Art Institute of Phoenix, but had come back to Indiana at the end of his second year to seek treatment for his first major depressive episode.  (Tr. 43-45, 55.)  Kemerly subsequently lost interest in creative art (Tr. 44); he now plays video games, mostly computer ones (Tr. 40-41).  Kemerly last worked at Game Stop as a retail clerk; he quit because

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 322-page administrative record necessary to the decision.

2

the job was becoming increasingly stressful for fewer hours and a 45-minute commute.  (Tr. 44-45.)  He drives and has a car that his parents fill up with gas.  (Tr. 47.)  Kemerly reported that he does not "really go much of anywhere," but will go out to eat with a friend on Fridays.  (Tr. 47.)

### C.  Other Witness Testimony

Kemerly's mother also testified at the hearing.  (Tr. 50-53.)  She reported that Kemerly has problems with motivation and promptness and suffers from a "social phobia," in that he does not interact well with strangers.  (Tr. 51-52.)  After the ALJ commented that Kemerly seemed "as cool as a cucumber" during the hearing, she explained that her son is "a really intelligent person" and understands that the hearing is "a really important thing in his life."  (Tr. 53.)

### D.  Summary of the Relevant Medical Evidence

In May 2004, a twenty-year-old Kemerly was evaluated by Cynthia Schroeder-Clark, a licensed clinical social worker.[3]  (Tr. 208-09, 308-09, 322.)  Kemerly reported that he had been depressed since middle school, but that the situation was much worse now; he had just returned from college in Arizona due to his inability to attend class and his best friend from high school had recently been killed by a drunk driver.  (Tr. 208, 308.)  Kemerly related social problems; his friends were often friends on the Internet and people he played games with online.  (Tr. 208, 308.)  Kemerly stated that his mother had been a very important figure in his life, but that she had done too much for him rather than him doing it for himself.  (Tr. 208, 308.)  He denied suicidal or homicidal ideation.  (Tr. 209, 309.)  His initial diagnosis was dysthymia (Tr. 208), but this was later changed to a major depressive disorder (Tr. 308).

Kemerly saw Schroeder-Clark three more times for therapy in May; he also missed one

---

[3] Although the evaluation form does not indicate who completed this evaluation (*see* Tr. 208-09, 308-09), both parties represent that Schroeder-Clark did (Opening Br. 2; Comm'r's Mem. in Supp. of Mot. 2).

3

appointment.  (Tr. 207.)  Kemerly reported that he spent his days alone, doing basically nothing.  (Tr. 207.)  He had decided not to return to school.  (Tr. 207.)  At the beginning of June, Kemerly had another therapy session with Schroeder-Clark.  (Tr. 207.)  He arrived late and related that he had spent the entire weekend at a friend's house playing video games.  (Tr. 207.)

Two days later, Kemerly saw Dr. Prevesh K. Rustagi, a psychiatrist, for an initial evaluation.  (Tr. 282-86.)  Kemerly reported depression that caused increased generalized anxiety with constant worry, procrastination, and a lack of motivation.  (Tr. 282.)  Kemerly wanted to isolate himself from others and had little motivation to follow a simple routine.  (Tr. 282.)  Dr. Rustagi diagnosed him with major depressive disorder, single episode, unspecified; generalized anxiety disorder; and dysthymic disorder and assigned him a Global Assessment of Functioning ("GAF") score of 50.[4]  (Tr. 286.)  Dr. Rustagi prescribed Effexor.  (Tr. 286.)  At therapy a few days later, Schroeder-Clark observed that Kemerly was more talkative and making fewer nervous gestures.  (Tr. 207.)  They discussed his career and education options.  (Tr. 207.)

At the end of June, Kemerly returned to Dr. Rustagi.  (Tr. 281.)  Both Kemerly and his mother reported that he was doing well; he was sleeping a lot better and feeling better in general.  (Tr. 281.)  In August, Kemerly had another session with Schroeder-Clark; he was apprehensive about starting classes at IPFW a few days later.  (Tr. 198, 207.)  The following month, Kemerly saw Dr. Rustagi for medication management, complaining of procrastination issues, but stating that Effexor helped his anxiety a lot and that he was sleeping better.  (Tr. 280.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Id.

In October 2004, Kemerly cancelled his session with Schroeder-Clark due to illness.  (Tr. 198.)  The following month, Schroeder-Clark referred Kemerly to Dr. James Spink for psychological testing.[5]  (Tr. 205-06.)  In the referral letter, Schroeder-Clark indicated that Kemerly had been working part time for about 10 weeks, but had missed a part of each week for a variety of reasons.  (Tr. 205.)  His employer, who also employed Kemerly's father, reported that he liked the quality of Kemerly's work.  (Tr. 205.)

In the beginning of December, Schroeder-Clark wrote to Dr. Rustagi, expressing concern that Kemerly was still experiencing a significant level of depression and anxiety and that he was pushing himself to do things he did not want to do.  (Tr. 203.)  Kemerly saw Dr. Rustagi a couple of weeks later, reporting that Effexor helped his anxiety, "but not totally," and that his depression was partially improved.  (Tr. 278.)  Dr. Rustagi increased his medication.  (Tr. 278.)  At his next appointment with Dr. Rustagi in January 2005, Kemerly stated that the dose increase had been more helpful and that he wanted to concentrate and focus better.  (Tr. 277.)

Kemerly missed his appointment with Schroeder-Clark in February 2005 and then cancelled his appointment with her the following month due to a scheduling conflict.  (Tr. 198.)  He kept his appointment with Dr. Rustagi in March.  (Tr. 276.)  Dr. Rustagi noted that Kemerly remained very hard on himself, but denied any suicidal thoughts.  (Tr. 276.)  Kemerly also appeared for his appointment with Dr. Rustagi the following month, reporting that he was doing "reasonably well with his mood."  (Tr. 275.)  His mother stated that Kemerly went to school four days a week, but did not do much else and was socially isolated.  (Tr. 275.)  He continued to

_____

[5] Schroeder-Clark thought that Kemerly had some of the qualities of Asperger's, and Dr. Rustagi wanted him tested for underlying psychotic thinking.  (Tr. 206.)  Dr. Spink found that Kemerly did not have a problem with Asperger's and diagnosed him with bipolar I disorder, depressed, severe, with pre-psychotic features.  (Tr. 261-62.)

procrastinate and remained disorganized; Dr. Rustagi decided to try a stimulant. (Tr. 275.) By the end of May, Kemerly and his mother reported to Dr. Rustagi that he was happier, content, and more organized; his current medications were continued. (Tr. 274.)

Also in May of 2005, Kemerly saw Schroeder-Clark, reporting that he continued to feel better on his medications and that he had met a girl he wanted to ask out. (Tr. 198.) Schroeder-Clark found that Kemerly was willing to discuss his fear of social situations, a conversation which continued during therapy the following month. (Tr. 198.)

At Kemerly's next appointment with Dr. Rustagi in July 2005, Kemerly reported that he had experienced a difficult week a couple of weeks before, but had been doing better since. (Tr. 273.) Dr. Rustagi changed Kemerly's stimulant. (Tr. 273.) The next month, Kemerly's motivation was still lacking, and Dr. Rustagi changed his stimulant again. (Tr. 272.) By the end of August, Kemerly was procrastinating a lot, arriving late to class, and having difficulty falling asleep; Dr. Rustagi replaced his stimulant once again. (Tr. 271.) At his September appointment with Dr. Rustagi, Kemerly's mood was reasonably good and his attention span was inconsistent. (Tr. 270.) Dr. Rustagi increased his stimulant dose. (Tr. 270.)

In October 2005, Schroeder-Clark wrote another letter to Dr. Rustagi about Kemerly's progress. (Tr. 199-200.) She relayed that Kemerly continued to report problems with motivation and accomplishing tasks, such as completing his homework or arriving places on time. (Tr. 199.)

During his appointment with Dr. Rustagi at the beginning of November, Kemerly reported that he was still procrastinating a lot and that the stimulant was not helping in any significant way. (Tr. 269.) They also discussed his mother's enabling. (Tr. 269.) Kemerly's

6

Effexor dose was increased.  (Tr. 269.)  Two weeks later, Kemerly was still struggling with disabling anxiety.  (Tr. 268.)  Dr. Rustagi replaced Effexor with Fluoxetine.  (Tr. 268.)  A week later, Kemerly was still having some fluctuations in his mood, but overall in a positive direction; his Fluoxetine dose was increased.  (Tr. 267.)  By December, Dr. Rustagi observed that Kemerly was showing significant depression and started him on Cymbalta.  (Tr. 266.)

In January of 2006, Dr. Rustagi noted that Kemerly's anxiety, depression, and lack of motivation were improving very slowly.  (Tr. 265.)  The following month, Dr. Rustagi stated that Kemerly was unable to go to school or work because of his severe lack of initiative and motivation that was coming from his depression and that he was likely to remain disabled for "at least the next six months" and possibly longer depending on his medication response.  (Tr. 264.)  Also in February, Kemerly had a therapy session with Schroeder-Clark; he related that he continued to do little but play video games and work about four hours a week.  (Tr. 198.)  They talked about him applying for disability and what it meant.  (Tr. 198.)

By March, Dr. Rustagi found that Kemerly's "[t]reatment refractory depression" was worse than it had been in a long time and started him on Lamictal.  (Tr. 222.)  The next month, Kemerly and his mother saw "a flicker of hope with Lamictal"; while Kemerly was not optimistic, he was less pessimistic.  (Tr. 221.)  His Lamictal dose was increased.  (Tr. 221.)

In May, Kemerly saw Schroeder-Clark again for therapy, reporting that he no longer felt as apathetic and was no longer as interested in his online video games; he expressed more of a want or need to find a job and was talking about the future more.  (Tr. 198.)  Kemerly missed his next session in June and then cancelled another session later that month because of a scheduling conflict.  (Tr. 198.)  At the end of June, Kemerly kept his appointment with Dr. Rustagi; his

mood was stable and positive and his energy level was improving, but he still did not have a clear sense of direction.  (Tr. 220.)

The next month, Kemerly appeared for his session with Schroeder-Clark; she noted that he was feeling better, but continued to look at the world and himself in negative terms.  (Tr. 198.)  Kemerly expressed anger at his parents, identifying their "control," rather than his lack of job or illness, as the reason he was not back in school in Arizona.  (Tr. 198.)  He further discussed how he was being held back from doing more art projects because he could not keep his equipment out in the living room for when he wanted to use it.  (Tr. 198.)  When asked how willing he would be to play one of his video games in a similar situation, Kemerly admitted that he would "definitely" go to the living room to play if that were required.  (Tr. 198.)

At an August appointment, Dr. Rustagi observed that Kemerly was more energetic physically and mentally, but that he was still overly attached to his computer and had a very hard time venturing out.  (Tr. 219.)  He found that these issues were to be dealt with "more behaviorally" at that time.  (Tr. 219.)  By October 2006, Lamictal was still effective, and Dr. Rustagi increased Kemerly's dose again.  (Tr. 218.)  The following month, Dr. Rustagi found that Lamictal was clearly helping the quality and stability of Kemerly's mood.  (Tr. 217.)

At his next appointment with Dr. Rustagi in January of 2007, however, Kemerly had slipped back, but was trying to move forward again.  (Tr. 216.)  Dr. Rustagi encouraged Kemerly to return to psychotherapy.  (Tr. 216.)  In February, Dr. Rustagi noted that Lamictal was handling Kemerly's depression well, but that Kemerly was having problems with anxious avoidance; the more he fell behind in school, the harder it was for him to leave to go to school.  (Tr. 215.)  Dr. Rustagi prescribed him medication for anxiety.  (Tr. 215.)  Kemerly committed to

returning to regular therapy.  (Tr. 215.)

At the beginning of March, Kemerly resumed therapy with Schroeder-Clark.  (Tr. 196.) He reported that he was living with a friend from high school in an apartment, which his parents were paying for, and that he was afraid of school and depressed.  (Tr. 196.)  He was also isolating himself and avoiding his family.  (Tr. 196.)  At his next therapy session two weeks later, Kemerly had withdrawn from school for the second or third time.  (Tr. 196.)  He and Schroeder-Clark discussed the possibility of applying for disability, but Kemerly did not think his situation was bad enough to warrant that.  (Tr. 196.)

A week later, Kemerly saw Dr. Rustagi again, complaining that Lamictal was not helping his deep depression.  (Tr. 214.)  Dr. Rustagi observed that Kemerly remained quite nonfunctional and that his illness was rendering him chronically and significantly disabled; he supported Kemerly's withdrawal from school and stated that Kemerly was "not ready for either school or any gainful employment."  (Tr. 214.)  Dr. Rustagi decided to taper him off Lamictal.  (Tr. 214.) The next day, Kemerly met with Schroeder-Clark, reporting that he felt discouraged and that his anxiety had increased.  (Tr. 196.)

Kemerly had two appointments with Schroeder-Clark in April 2007.  (Tr. 196-97.)  He was increasingly apathetic and doing "nothing" but playing video games and sleeping late.  (Tr. 196.)  At the beginning of May, Kemerly cancelled his appointment with Schroeder-Clark because he overslept.  (Tr. 197.)  This same day, he met with Dr. Rustagi, who noted that he had been medication free for six weeks and continued to have periods of despair and be disinterested in most initiatives.  (Tr. 213.)  Dr. Rustagi started Kemerly on EMSAM.  (Tr. 213.)  Later that month, Kemerly told Schroeder-Clark that he was feeling slightly better and not as chained to his

computer and that his Internet friends had told him he was not as negative. (Tr. 197.)

In June of 2007, Dr. Rustagi saw "a ray of hope" with EMSAM; everyone Kemerly interacted with had noted a change since he began the patch. (Tr. 248.) Kemerly had two therapy sessions with Schroeder-Clark in June. (Tr. 254.) He reported difficulties accomplishing goals and a frustration with himself and his depression, which affected his motivation. (Tr. 254.)

Also in June, Robert J. Walsh, Pys.D., performed a mental status examination of Kemerly at the request of the state agency. (Tr. 226-28.) Dr. Walsh found that Kemerly's attention and concentration were good, but that his affect was flat and his mood was withdrawn. (Tr. 227.) He diagnosed Kemerly with major depressive disorder, recurrent and moderate, and assigned him a GAF of 50. (Tr. 228.)

The following month, Joelle J. Larsen, Ph.D., a state agency psychologist, reviewed Kemerly's file and completed a "Psychiatric Review Technique" form. (Tr. 231-44.) Dr. Larsen concluded that Kemerly's impairments were not severe, that he appeared to have the cognitive abilities and concentration necessary to complete tasks, and that his psychological difficulties were not significantly limiting. (Tr. 231, 243.) A second state agency psychologist later affirmed this assessment. (Tr. 250.)

Also in July, Kemerly told Dr. Rustagi that his mood was somewhat better, but he was having some difficulty changing his long-standing dysfunctional habits. (Tr. 247.) Kemerly also saw Schroeder-Clark twice in July and then once in August and twice in September. (Tr. 253-54.) At his first September therapy session, Kemerly felt that he had regressed in the past two weeks. (Tr. 253.) Kemerly arrived late to his second September session and reported that he

was frustrated with himself for not making any positive changes, was feeling worse and isolating himself, and had no motivation.  (Tr. 253.)  Although his mood was slightly better, it resulted in no change behaviorally.  (Tr. 253.)  Also in September, Kemerly saw Dr. Rustagi for medication management, stating that his mood was better and more stable and that his biggest problem was behavioral; he needed to work on changing old habits.  (Tr. 246.)

In October 2007, Schroeder-Clark wrote a letter to the state agency in which she opined that Kemerly was suffering from "very treatment resistant" depression, had made small, but temporary, gains, and was unable to attend school or to work..  (Tr. 252.)  Schroeder-Clark found that, although Kemerly understood what he needed to do, his depression was severe enough that he was unable to follow through with efforts to improve his situation.  (Tr. 252.)

Schroeder-Clark also saw Kemerly for therapy in October.  (Tr. 307.)  Kemerly continued to struggle with motivation and follow through and stayed on the computer for extended periods of time, spending hours playing online games.  (Tr. 307.)  By November, Kemerly told Schroeder-Clark that he had cut back slightly on Internet gaming, but still spent excessive amounts of time on this activity.  (Tr. 307.)  In December, Kemerly saw Schroeder-Clark twice, reporting continued problems completing tasks.  (Tr. 306.)  Kemerly also had an appointment with Dr. Rustagi in December, at which he expressed that he was making progress lately in therapy and that he hoped his new insights would help him break through the barrier keeping him from being functional.  (Tr. 320.)

Kemerly had two therapy sessions with Schroeder-Clark in January of 2008.  (Tr. 306.)  At the second, he reported that he had been exceptionally depressed over the last few weeks and that it was difficult for him to motivate himself.  (Tr. 306.)  By his therapy session the following

month, however, Kemerly appeared brighter and less depressed.  (Tr. 306.)  Although he felt less depressed, he saw no change in his behaviors; he was still not seeking out any new activities and was spending quite a bit of time on video games.  (Tr. 306.)  In March, Kemerly told Schroeder-Clark that he continued to struggle with motivation and setting goals for himself.  (Tr. 306.)

When Kemerly met with Dr. Rustagi in March, he reported that EMSAM was working as he expected and that he had been into some negative habits for a long time.  (Tr. 319.)  His mother agreed to have him move back home to get him in a regular routine.  (Tr. 319.)

Schroeder-Clark saw Kemerly once in April, twice in May, and twice in June of 2008 for therapy.  (Tr. 306.)  At his medication management review with Dr. Rustagi in the beginning of June, Kemerly reported that his mood was improving very slowly as he set specific goals for himself and accomplished them.  (Tr. 318.)  His mother saw him following through with his commitments better.  (Tr. 318.)  By the end of June, Kemerly told Schroeder-Clark that he had fallen back into extreme and excessive use of the computer and Internet.  (Tr. 305.)

At his July 2008 therapy session with Schroeder-Clark, Kemerly stated that he had moved back in with his parents, had almost no motivation, and was frustrated because his computer was not working properly due to his parents' dial-up, as opposed to cable, Internet.  (Tr. 304.)  In August, Kemerly was still unmotivated and frustrated with his lack of progress; he was considering going back to college in the winter.  (Tr. 304.)

Kemerly saw Dr. Rustagi in September, complaining of low energy and motivation.  (Tr. 317.)  EMSAM was helping in a limited way.  (Tr. 317.)  Kemerly had therapy with Schroeder-Clark a few days later, continuing to report a lack of motivation.  (Tr. 304.)  He had a couple of friends stay overnight, and they stayed up all night on their computers.  (Tr. 304.)  Kemerly then

saw Schroeder-Clark once a month in October, November, and December of 2008.  (Tr. 304.)

He continued to arrive late and report procrastination problems.  (Tr. 304.)  Kemerly stated that

he had gone to an overnight gaming event in Indianapolis with friends and played video games

for hours without sleeping.  (Tr. 304.)  In December, Kemerly and his mother told  Dr. Rustagi

that Kemerly was making slow but definite progress.  (Tr. 316.)

     In the beginning of 2009, Kemerly had therapy with Schroeder-Clark twice in January,

once in February, and once in March.  (Tr. 303.)  He had still not followed through on the

possibility of returning to college and continued to lack motivation.  (Tr. 303.)  At his March

appointment with Dr. Rustagi, Dr. Rustagi noted that Kemerly's mood was improving slowly

and that he had shown small improvements in work initiative and socialization.  (Tr. 315.)

     Kemerly then saw Schroeder-Clark once in May and twice in June.  (Tr. 302-303.)

During the May session, Schroeder-Clark wrote that "[i]t is very difficult to determine how much

of [Kemerly's] condition is depression and how much is behavioral."  (Tr. 303.)  In June,

Kemerly reported that he was still "thinking" about looking for a job; he was considering one

that was 15 hours per week and an hour-commute each way.  (Tr. 303.)  The time he spent on the

computer was increasing.  (Tr. 302.)  When Kemerly saw Dr. Rustagi in June, Dr. Rustagi

observed that he continued to show small increments of improvement in his outlook, attitude,

and motivation, but that his motivation remained rather small.  (Tr. 314.)

     In July 2009, Kemerly told Schroeder-Clark that he had been struggling lately and was

very apprehensive about the possibility of attending school in the fall.  (Tr. 302.)  He was again

thinking about looking for part-time work.  (Tr. 302.)  Kemerly met with Dr. Rustagi in

September.  (Tr. 313.)  On mental status exam, Dr. Rustagi found him sad and discouraged; he

diagnosed Kemerly with attention deficit hyperactivity disorder ("ADHD") and dysthymic disorder and discontinued EMSAM.  (Tr. 313.)

In November 2009, Dr. Rustagi completed a "Mental Impairment Questionnaire" and medical source statement on Kemerly.  (Tr. 256-60.)  He indicated that Kemerly's diagnoses were major depression; ADHD; and personality disorder, NOS; and that his current and highest-past-year GAFs were both 50.  (Tr. 256.)  Dr. Rustagi stated that during the five years he had known Kemerly, he had shown a very severe and persistent, treatment resistant sadness, anxiety, lack of motivation, lack of concentration, and lack of productivity that had not responded to intensive medication management and psychotherapy.  (Tr. 257.)  He also opined that Kemerly would miss work more than four days of work per month due to his impairments or treatment. (Tr. 258.)  Dr. Rustagi further concluded in his medical source statement that Kemerly had a poor ability to perform ten of the twenty-two mental work-related activities, a fair ability to perform eight of those activities, and a good ability to perform only four of them.  (Tr. 259-60.) Dr. Rustagi did conclude, however, that Kemerly could manage his own benefits.  (Tr. 260.)

Also in November 2009, Schroeder-Clark wrote a letter to Kemerly's attorney, in which she noted that Kemerly, with his parents' help, had been consistent with attendance.  (Tr. 321.) She then opined that Kemerly's depression prevented him from being able to work or attend school even on a very limited basis and that, if he were to try either, she would not expect him to maintain the activity for more than a week or two, even if his schedule was limited to 6 to 8 hours per week.  (Tr. 321-22.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

14

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920.  An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On September 21, 2010, the ALJ rendered his decision.  (Tr. 20-34.)  He found at step one of the five-step analysis that Kemerly had not engaged in substantial gainful activity since the application date, and, at step two, that Kemerly had a severe mental impairment.  (Tr. 22-23.)  At step three, he determined that Kemerly's impairment or combination of impairments did not meet or medically equal a listing.  (Tr. 23-25.)  Before proceeding to step four, the ALJ determined that Kemerly was not entirely credible and that his depression was not as severe as

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), that is, what tasks the claimant can do despite his limitations.  20 C.F.R §§ 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 416.920(e).

alleged, but concluded that he would have difficulty with intense criticism and close oversight. (Tr. 25-28.)  As such, the ALJ assigned Kemerly a RFC that restricted him from performing "work that imposes close regimentation of production."  (Tr. 28.)  Based on this RFC and the VE's testimony, the ALJ concluded at step four that Kemerly was able to perform his past relevant work as an industrial cleaner and video game clerk.  (Tr. 28-29.)  The ALJ then found at step five that Kemerly could perform a significant number of other unskilled, light and medium jobs within the economy.  (Tr. 29-30.)  Therefore, Kemerly's claim for SSI was denied.  (Tr. 30.)

### C.  The ALJ's Consideration of Dr. Rustagi's Opinion Is Supported by Substantial Evidence

In his appeal, Kemerly first attacks the ALJ's discounting of Dr. Rustagi's opinion. Although the ALJ gave some weight to Dr. Rustagi's opinion, he did not give the opinion great weight for a variety of reasons, most of which Kemerly challenges.  (*See* Opening Br. 20-24.) While, as explained below, the ALJ's opinion is not perfect, as a whole, his discounting of Dr. Rustagi's opinion is supported by substantial evidence.

While the Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances," *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 416.927(c)(2), this principle is not absolute.  Accordingly, "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 416.927(c)(2).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors

17

to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  20 C.F.R. § 416.927(c); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Here, in February 2006, Dr. Rustagi, Kemerly's treating psychiatrist, found that Kemerly was unable to go to school or work because of his severe lack of initiative and motivation that was coming from his depression and that he was therefore disabled for at least six months and possibly longer.  (Tr. 264.)  The ALJ rejected this opinion, stating that "[l]ack of initiative is not disabling, and cannot work is different from does not want to work."  (Tr. 26.)  Kemerly first challenges this rationale, arguing that it is not supported by substantial evidence because lack of initiative or motivation is a symptom of major depression.  (Opening Br. 21.)

Although "[m]arkedly diminished interest or pleasure in all, or almost all, activities most of the day" is a symptom of major depression, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 356 (4th ed., Text Rev. 2000), the diagnosis of an impairment does not alone establish its severity or limitations, *see Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 1998). Kemerly certainly displayed a lack of motivation or initiative to do certain things, such as working or completing schoolwork or household chores.  But, as the ALJ pointed out, despite Kemerly's claims that he could not complete tasks due to lack of motivation, he was able to play video games for two to three hours at a time and read books; he did these activities in lieu of completing housework or other chores.  (Tr. 26 (citing Tr. 164-66, 168-77).)  Furthermore, the

18

ALJ noted that Kemerly quit his video clerk job for reasons unrelated to his inability to perform the job—namely because the new store manager would not help him transfer to a more convenient location.  (Tr. 26 (citing Tr. 164-66).)

Therefore, Dr. Rustagi's conclusion that Kemerly suffered from a disabling lack of initiative or motivation is inconsistent with Kemerly's ability to spend hours playing video games, even traveling to Indianapolis for an overnight gaming event (Tr. 304) and spending entire nights or weekends playing video games with friends (Tr. 207, 304), and doing other things he *wanted* to do rather than things he did not want to do or that became too difficult or inconvenient, like commuting to work or setting up his art equipment (*see* Tr. 198 (where Kemerly admitted that he was not willing to set up his art equipment in his parents' living room, but would be willing to go to the living room to play video games if required)).  And the ALJ explicitly concluded that Kemerly "can concentrate on things he likes to do and, as acknowledged by his mother and representative at the hearing, can perform when he knows it is important to do so."  (Tr. 26.)  The ALJ can—and, in fact, must—consider the consistency between a treating source's opinion and the record as a whole, *see Books*, 91 F.3d at 979; 20 C.F.R. § 416.927(c)(4), which is exactly what the ALJ did here.[7]

---

[7] Kemerly further argues that both Dr. Rustagi and Schroeder-Clark concluded, after careful consideration, that his motivation problems were related to his depression rather than behavioral.  (Opening Br. 21.)  But this is not entirely true.  Although Dr. Rustagi found in January 2006 that Kemerly's severe lack of initiative and motivation came from his depression (Tr. 264), in May 2009, Schroeder-Clark found it "very difficult to determine how much of [his] condition is depression and how much is behavioral" (Tr. 303).  The record also contains other suggestions that Kemerly's lack of motivation and initiative may have been more behavioral than symptomatic of his depression.  (*See, e.g.*, Tr. 219 (where Dr. Rustagi found that Kemerly's issues had to be worked on "more behaviorally" at that time), 246 (where Kemerly reported that his biggest problem was behavioral), 247 (where Kemerly reported that he had a hard time changing long-standing dysfunctional habits), 253 (where Kemerly reported an improved mood, but no change behaviorally, including a continued lack of motivation).)  Nonetheless, even if Kemerly's lack of motivation and initiative were due to his depression, the ALJ found Dr. Rustagi's opinion about Kemerly's disabling lack of initiative contradicted by his demonstrated motivation to do things he wanted to do, but not those he did not want to do, a conclusion that is supported by substantial evidence.

In his November 2009 medical source statement, Dr. Rustagi further opined that Kemerly "has shown *very severe and persistent treatment resistant sadness*, anxiety, lack of motivation, lack of concentration and lack of productivity that have not responded to intensive medication management and psychotherapy" (Tr. 27 (emphasis in ALJ's decision) (citing Tr. 257)) and that he would miss more than four days of work a month (Tr. 258), a level of absenteeism that, according to the VE's testimony, would make it difficult to maintain competitive employment (*see* Tr. 57).  The ALJ found that Dr. Rustagi did not support his opinion or provide a global assessment to measure the impact on Kemerly's functioning.  (Tr. 27.)  He further stated that there was no rationale to support a finding that Kemerly could not work; that despite Dr. Rustagi's assertions that Kemerly's symptoms were severe, he had never been hospitalized or had any suicidal ideation or made any attempts; and that Dr. Rustagi concluded that Kemerly could manage his funds.  (Tr. 27.)  And the ALJ also determined that the lack of a reliable foundation for Dr. Rustagi's opinion raised doubts about his methods or motivation, noted that his opinion appeared to have been issued to promote Kemerly's claim for benefits and at the request of Kemerly's representative, and found that Dr. Rustagi failed to explain why Kemerly could successfully pursue his complex hobbies despite his severe limitations.  (Tr. 27.)  Kemerly challenges several of these reasons.

First, Kemerly argues that his lack of hospitalizations for depression is not necessarily inconsistent with Dr. Rustagi's finding that he would miss work due to depression or a finding that his depression was disabling.  (Opening Br. 21–22.)  This argument, however, is a nonstarter.  The ALJ is permitted to consider the course of treatment that Kemerly was prescribed in determining the weight to assign to an opinion, which includes whether he was

hospitalized.  *See Thomas v. Astrue*, No. 1:11-CV-00355, 2012 WL 5183574, at *7 (N.D. Ind.

Oct. 18, 2012); 20 C.F.R. § 416.927(c)(2)(ii) (articulating that the ALJ may consider "the

treatment the source has provided and the kinds and extent of examinations and testing the

sources has performed or ordered from specialists and independent laboratories" when deciding

the weight to assign to a medical opinion).  And the ALJ did not explicitly find Kemerly's lack

of hospitalizations inconsistent with Dr. Rustagi's absenteeism opinion.  Rather, the ALJ cited

Kemerly's lack of hospitalizations as simply one reason why Dr. Rustagi's assertion that

Kemerly's symptoms were very severe—in fact so severe that Kemerly reportedly had a poor

ability to perform ten of twenty-two mental activities and only a fair ability to perform eight such

activities (Tr. 259-60)—was inconsistent with the record as a whole, which the ALJ is expressly

permitted to do.  20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with

the record as a whole, the more weight we will give that opinion."); *see Honeysett v. Astrue*, No.

1:11-CV-369, 2012 WL 3656425, at *11 (N.D. Ind. Aug. 23, 2012) (rejecting claimant's

argument that the ALJ "played doctor" when he used her lack of inpatient psychiatric

hospitalizations as one illustration of how her treating physician's opinion was not consistent

with the record as a whole).

 Kemerly's next argument—that the ALJ mistakenly concluded that Dr. Rustagi did not

provide a global assessment to measure the impact on his functioning—is correct.  (Opening Br.

22.)  Dr. Rustagi did provide a global assessment of Kemerly's functioning in the form of two

GAF scores of 50.  (Tr. 256, 286.)  Yet, "[n]ot every mistake by an ALJ so undermines a

determination that it cannot be said to be supported by substantial evidence."  *Bacidore v.*

*Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002) (citation omitted).

Because the ALJ's other stated reasons provide substantial evidence for his decision to discount Dr. Rustagi's opinion, this mistake did not change the outcome of this case, making it harmless.[8] *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Susalla v. Astrue*, No. 1:11-CV-00164, 2012 WL 2026268, at *10 (N.D. Ind. June 5, 2012) (finding that, because the ALJ provided several other "good reasons" to discount a treating source's opinion, one misstep did not warrant a remand).

Next, contrary to the ALJ's conclusion that Dr. Rustagi did not support his opinion, Kemerly contends that Dr. Rustagi *did* explain why Kemerly would miss work due to his condition—because of his severe and persistent depression, treatment resistant sadness, anxiety, and lack of motivation, concentration, and productivity, which had not responded to intensive medication management and psychotherapy. (Opening Br. 23 (citing Tr. 257 (where Dr. Rustagi lists these as the clinical findings that demonstrate the severity of Kemerly's impairments)).) But Dr. Rustagi does not explain how these clinical findings would require Kemerly to miss more than four days of work per month. At step three, Kemerly "bears the burden of proving that [he] is disabled, and [Kemerly] failed to present any medical evidence linking [his] condition] to the *unacceptable* level of absenteeism [he] alleges." *Castile v. Astrue*, 617 F.3d

---

[8] Within this argument, Kemerly also contends that the ALJ erred by ignoring the GAF scores in the record. (Opening Br. 22-23.) But "[n]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted). And this is not a case in which the ALJ impermissibly ignored low GAF scores while considering higher ones. *Pickett v. Astrue*, No. 1:11-cv-0160-SEB-DML, 2012 WL 4470242, at *6 n.3 (S.D. Ind. Sept. 27, 2012); *see, e.g.*, *Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished) (finding error when the ALJ cited high GAF scores but not low ones). As such, the ALJ's failure to mention any of the GAF scores in the record does not warrant a remand.

923, 927 (7th Cir. 2010) (emphasis added) (citations omitted); *see* 20 C.F.R. § 416.912(a).

Here, Kemerly was never hospitalized for psychiatric reasons (Tr. 226) so he would not need to miss work due to frequent hospital visits. *See Brown v. Astrue*, No. 1:10-CV-00450, 2011 WL 5102276, at *8-9 (N.D. Ind. Oct. 27, 2011). Moreover, although the record reflects that Kemerly missed seven appointments with Schroeder-Clark, this was over five and a half years of treatment, he usually cancelled with an excuse (Tr. 197 (cancelled May 2007 session due to oversleeping), 198 (cancelled October 2004 session due to illness, missed one session in February 2005 and another in June 2006, and cancelled one in March 2005 and one in June 2006 due to scheduling conflicts), 204 (missed a May 2004 appointment)), and he had not missed a session with her since May 2007 (Tr. 197). In her opinion letter, Schroeder-Clark even stated that, with his parents' help, Kemerly had been consistent in his attendance. (Tr. 321.) And he does not appear to have missed an appointment with Dr. Rustagi. *Cf. Punzio v. Astrue*, 630 F.3d 704, 711 (7th Cir. 2011) (finding a treating psychiatrist's conclusion about the claimant's propensity for absenteeism adequately supported by frequent missed appointments in the record). Accordingly, this evidence, which Dr. Rustagi did *not* provide to explain his absenteeism opinion, fails to support the high rate of absenteeism—more than four days a month—that Dr. Rustagi found (Tr. 258). As such, this argument also fails to warrant a remand.

Kemerly next contends that, contrary to the ALJ's statement, his gaming activities were not inconsistent with an inability to sustain work because his ability to "struggle through" daily living activities, as evidenced by his tendencies to zone out, isolate himself, and miss therapy appointments, did not mean that he could work. (Opening Br. 23.) In explaining why he discounted Dr. Rustagi's opinion, the ALJ stated that "Dr. Rustagi failed to explain why

23

[Kemerly] can successfully pursue his complex hobbies despite his severe limitations."  (Tr. 27.)
These severe limitations included Kemerly's "poor ability"—meaning no useful ability to
function—to maintain attention and concentration for extended periods, understand, remember,
and carry out detailed instructions, and work with or near others without being distracted by
them.  (Tr. 259.)  Yet Kemerly's "complex hobbies" consisted of playing online video games,
which sometimes involved "increasingly difficult group challenges, with loose competition
between organized groups" (Tr. 165), for hours at a time or even overnight without sleeping (Tr.
304), or, according to his mother, building computers from the ground up (Tr. 145).  Moreover,
Kemerly's mother reported that although Kemerly's attention is affected by how well he is
coping, "[d]epending on the subject, if [Kemerly] is interested and focused he does not have any
problems with attention."  (Tr. 146.)  As such, at least some of the severe limitations Dr. Rustagi
found are inconsistent with Kemerly's ability to successfully pursue his complex hobbies,
providing substantial evidence for the ALJ's decision to discount Dr. Rustagi's opinion because
of this inconsistency.[9]  *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical
evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

In discounting Dr. Rustagi's opinion, the ALJ also considered that it appeared to have
been issued to promote Kemerly's claim for benefits and at the request of his representative.  (Tr.
27.)  Kemerly challenges this reasoning, and persuasively so, as the Seventh Circuit has stated

---

[9] As to the evidence purportedly showing that Kemerly struggled through his daily activities, the ALJ
considered much of this (*see, e.g.*, Tr. 25-26 (noting reports that Kemerly stayed in his room, suffered from a "social
phobia," and could not complete tasks due to lack of motivation)) and ultimately rejected most of it (*see, e.g.*, Tr. 26
(stating that the evidence did not support a finding that Kemerly experienced significant social phobia, that he had
any deficit in concentration and attention, or that he was disabled due to reclusive behavior and depression)).  As the
ALJ need not mention or make a written evaluation of every snippet of evidence in the record, *Arnett v. Astrue*, 676
F3.d 586, 591 (7th Cir. 2012), this argument also fails.

24

that an ALJ may not discount a treating physician's opinion just because it was solicited by the claimant or his representative. *Punzio*, 630 F.3d at 712-13 ("[T]he fact that relevant evidence has been solicited by the claimant or [his] representative is not a sufficient justification to belittle or ignore that evidence."). But in this instance, the ALJ also considered the bias that a treating physician may employ. (*See* Tr. 27 ("The lack of a reliable foundation for [Dr. Rustagi's] opinion raises doubts about the physician's methods or motivation.")); *see Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985))). Of course, "an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims." *Labonne v. Astrue*, 341 F. App'x 220, 225 (7th Cir. 2009) (unpublished) (citations omitted); *see Hofslien*, 439 F.3d at 377. Since the ALJ provided several other good reasons to discount Dr. Rustagi's opinion, the ALJ's comment concerning Kemerly's representative's solicitation of the evidence falls short of reversible error. *See Fisher*, 869 F.2d at 1057 (recognizing that the ALJ's opinion was vulnerable, but finding that this was "nothing new" and alone does not require remand).

Kemerly further objects to the ALJ considering that Kemerly had worked during his alleged period of disability, arguing that the work was very sporadic and not indicative of an ability to work on a sustained basis.[10] (Opening Br. 24.) But an ALJ can consider a claimant's

---

[10] Kemerly maintains that the ALJ used his work history as one reason to discount Dr. Rustagi's opinion. (Opening Br. 20, 24.) Although the ALJ references Kemerly's ability to work in the past, he does not appear to do so in the context of discounting Dr. Rustagi's opinion. (*See* Tr. 27-28.) Nevertheless, the Court will accept Kemerly's interpretation for the purposes of this Opinion.

ability to perform part-time work in determining whether he is completely disabled. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). Moreover, here, the ALJ did not go so far as to improperly equate Kemerly's previous part-time work with an ability to work full time. *Stolte v. Astrue*, No. 1:10-CV-00087, 2010 WL 4852455, at *10 (N.D. Ind. Nov. 19, 2010). Therefore, this challenge to the ALJ's decision also fails.

Finally, Kemerly's contends that the ALJ failed to properly evaluate the "checklist factors" when giving weight to Dr. Rustagi's opinion. (Opening Br. 24.) "It is true that [20 C.F.R. § 416.927(c)] requires the ALJ to consider those six factors, but his decision need only include 'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (unpublished)); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that no case law was found "requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion"). Therefore, it is enough if the ALJ generally covers the ground of 20 C.F.R. § 416.927(c) and provides "good reasons" for the weight assigned to the treating source's opinion. *Hanson*, 2011 WL 1356946, at *12; *accord Oldham*, 509 F.3d at 1258 (noting that the ALJ provided good reasons for the weight given to a treating source's opinion and that "[n]othing more was required").

Here, the ALJ adequately considered the checklist factors as they applied to Dr. Rustagi. He noted that Dr. Rustagi was Kemerly's treating psychiatrist (Tr. 26), taking into account both

Dr. Rustagi's specialty and the nature of his relationship with Kemerly, and recognized that his involvement with Kemerly was "significant" and that he gave "consistent attention" to Kemerly (Tr. 27). And the ALJ considered how much supporting evidence Dr. Rustagi provided—as the ALJ found, none—and the consistency between his opinion and the record as a whole. (*See* Tr. 27.) Despite the ALJ's thorough consideration of these factors, Kemerly argues that the ALJ did not explain why his opinion was not given more weight because of these factors. (Reply Br. 8.) Kemerly's argument, however, amounts to no more than nit-picking of the ALJ's decision, which this Court will not entertain. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

Despite Kemerly's various challenges to the ALJ's consideration of Dr. Rustagi's opinion, his decision to discount Dr. Rustagi's opinion is, overall, supported by substantial evidence, precluding a remand on this basis.

### D.  The ALJ's Consideration of Schroeder-Clark's Opinion Is Supported by Substantial Evidence

Kemerly also challenges the ALJ's consideration of Schroeder-Clark's opinion, in which she found that Kemerly would not be able to maintain work for more than a week or two even if limited to 6 to 8 hours a week. (Opening Br. 24-25 (citing 321-22).) The ALJ did not accord Schroeder-Clark's opinion substantial weight because she did not have the necessary credentials to be considered a treating source and did not explain how she reached her conclusions. (Tr. 26-27.) Kemerly attacks both of these reasons in challenges that are ultimately unpersuasive.

Schroeder-Clark, a licensed clinical social worker, is considered an "other source" under the regulations. *See Wyatt v. Astrue*, No. 1:11-cv-00874-MJD-JMS, 2012 WL 2358149, at *6

27

(S.D. Ind. June 20, 2012); 20 C.F.R. § 416.913(d); SSR 06-03p, 2006 WL 2329939.  Opinions from "other sources" should be evaluated using the applicable factors set forth in 20 C.F.R. § 416.927 for weighing medical opinions from "acceptable medical sources."  SSR 06-03p, 2006 WL 2329939.  However, "[n]ot every factor for weighing opinion evidence will apply in every case" and "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case."  *Id*.

In the instant case, when considering Schroeder-Clark's opinion, the ALJ first noted that the weight of her opinion was diminished because she did not have the necessary credentials to be considered a treating source, but then continued on, stating that the information in her opinion had been taken into account in accordance with SSR 06-3p.  (Tr. 26.)  Kemerly claims that the ALJ only gave "lip service" to this ruling, failing to properly consider her various credentials, such as her 17 years of practice as a licensed clinical social worker and her master's degree from the University of Michigan, or the length and frequency of her treatment history with Kemerly, which encompassed over five years and fifty-two visits.  (Opening Br. 25; Reply Br. 10.)  But the ALJ recognized that Schroeder-Clark had a Master of Social Work degree and that Kemerly had been in outpatient therapy with her since May 2004, addressing her specialty and the nature and length of their relationship.  (Tr. 26.)  Like with Dr. Rustagi, the ALJ further described Schroeder-Clark's involvement with Kemerly as significant and acknowledged that she provided "consistent attention" to him.  (Tr. 27.)  Although the ALJ did not mention all of Schroeder-Clark's qualifications and experience or the exact number of her therapy sessions with Kemerly, the ALJ is not required to mention every snippet of evidence in the record; rather, he must connect the evidence to the conclusion without ignoring entire lines of contrary evidence.

*Arnett*, 676 F.3d at 591; *see Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ did that here.

After acknowledging Schroeder-Clark's status as an "other source," the ALJ went on to consider her opinion, determining that she did not explain how she reached her conclusions.  (Tr. 26-27.)  Specifically, the ALJ recognized an inconsistency between Schroeder-Clark's opinion and the record as a whole, stating that Schroeder-Clark did not explain why Kemerly could concentrate and focus on and successfully play video games, but could not perform work-related activities.  (Tr. 27.)  Once again, the ALJ was permitted to discount Schroeder-Clark's opinion based on inconsistencies he found between her opinion and the record as a whole.  *See Zblewski v. Astrue*, 302 F. App'x 488, 493-94 (7th Cir. 2008) (unpublished) (affirming the ALJ's discounting of a nurse's opinion where it was inconsistent with the medical evidence of record); *Knight*, 55 F.3d at 314; 20 C.F.R. § 416.927(c)(4).

In response, Kemerly renews his argument that his ability to play video games for two to three hours at a time is not inconsistent with his inability to work, which this Court already rejected.  Not to be deterred, Kemerly maintains that Schroeder-Clark was aware of his computer activities and addressed them in her records, viewing them as a "negative" rather than a "positive."  (Reply Br. 8.)  But Schroeder-Clark's acknowledgment and disapproval of Kemerly's computer activities does not cure the inconsistency the ALJ observed between her opinion and the record.  If, as Schroeder-Clark opines, Kemerly's condition, which purportedly affected his motivation and concentration, prevented him from working or attending school even on a very limited basis for more than a week or two, then how did he maintain the ability to concentrate on, focus on, and successfully play video games, many of them in groups,

consistently over the more than five years she treated him?  That is the inconsistency that

Schroeder-Clark failed to explain, and the ALJ properly discounted her opinion because of it.

Accordingly, substantial evidence supports the ALJ's consideration of Schroeder-Clark's

opinion as well, and a remand is not warranted on this basis either.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

Clerk is directed to enter a judgment in favor of the Commissioner and against Kemerly.

SO ORDERED.

Enter for this 22nd day of January, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge